IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| CITY OF WEST DES MOINES, IOWA, | ) | Case No. 4:23-cv-000466-SMR-WPK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER ON MOTION FOR SUMMARY |
| PHILDELPHIA INDEMNITY | ) | JUDGMENT |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BERNARD FELDMAN, AVA FELDMAN, | ) | |
| and THE BERNARD M. FELDMAN | ) | |
| REVOCABLE TRUST, | ) | |
| | ) | |
| Intervenors. | ) | |

DB Booneville LLC ("DB Booneville") obtained approval from the City of West Des Moines ("City") for a subdivision development project by posting two subdivision bonds as security for completion of required site improvements. After completing initial site work and infrastructure improvements, the project fell apart. The City now seeks to enforce those bonds to complete the required improvements, while the surety Philadelphia Indemnity Insurance Company ("Philadelphia"), contends enforcement would be inappropriate because no damages have been suffered. The City has moved for summary judgment, which is resisted by Philadelphia and Intervenors Bernard Feldman, Ava Feldman, and the Bernard M. Feldman Revocable Trust ("Feldmans").

# I.    BACKGROUND

## A.    *Factual Background*

This dispute in this case centers on a failed development project and the obligations that survive its demise.  The Village at Sugar Creek was a proposed multi-family residential, office, and retail development in Dallas County, Iowa.  DB Booneville submitted an application to the City for approval of the development.  [ECF No. 30-1 ¶ 4].  Section 10-3-2 of the West Des Moines City Code requires that—before the City Council approves a final plat—a developer must either complete all required improvements or post a bond guaranteeing completion within one year of final plat approval.  *Id.* ¶ 1.

In September 2022, DB Booneville retained Civil Engineering Consultants, Inc. ("CEC") to prepare construction drawings for the development.  *Id.* ¶ 5.  On September 14, 2022, Greiner Construction provided a cost estimate of $3,700,152.17 for the public improvements based on CEC's drawings dated September 9, 2022.  [ECF No. 43-1 ¶¶ 55–57].

Philadelphia issued two subdivision bonds (collectively, "Bonds") for the development: Bond No. PB02315100001 ($1,872,580.00) and Bond No. PB02315100002 ($1,537,935.00), for a total of $3,410,515.  The Bonds reference a September 14, 2022 agreement between the City and DB Booneville, although no specific agreement exists.  *Id.* ¶¶ 52–53.  The Bonds named the City as obligee, but they were paid for by DB Booneville.  *Id.* ¶ 61.  The Bonds did not expressly guarantee completion within one year of final plat approval, nor did they contain maintenance or warranty obligations.  *Id.* ¶ 54.

On November 7, 2022, the City approved the final plat for The Village at Sugar Creek Plat 1 based on construction drawings dated October 25, 2022.  *Id.* ¶¶ 58–59.  In conjunction with this approval, DB Booneville deeded to the City the property upon which the right-of-way improvements were to be constructed.  *Id.* ¶ 68.

DB Booneville's contractor, Elder Corporation, completed some site work, including rough grading, installation of 1,923 feet of water main, 225 feet of sanitary sewer, and some erosion control measures.  [ECF No. 30-1 ¶ 9].  Despite these initial improvements, erosion issues emerged on the property.  The City was purportedly aware of erosion problems as early as August 22, 2022, before the Bonds were issued.  [ECF No. 43-1 ¶ 43].

After work on the development ceased, the property went into foreclosure and came under the control of a receiver for DB Booneville's lenders.  *Id*. ¶ 33.  The City sought remediation of the erosion issues from DB Booneville's lender and the receiver, but both declined to act.  *Id*. ¶ 67.  In response, the City undertook efforts to remedy what it determined to be non-compliance with federal and state stormwater discharge regulations.  *Id*. ¶ 70.  This expenditure totaled $223,014.96 in construction costs and engineering services.  [ECF No. 30-1 ¶ 11].

The City now seeks to recover the full penal sums of the Bonds, $3,410,515, to complete all site improvements in the public right-of-way as depicted in the approved October 25, 2022 plans.  The City has not yet incurred any costs beyond the erosion control work, but intends to complete the remaining improvements if it recovers the bond proceeds.  [ECF No. 43-1 ¶ 72].  City engineer Tom Stovie provided an estimate of $3,543,699.83 to complete all site improvements based on the October 25, 2022 plans.  [ECF No. 30-1 ¶ 12].

## II.    DISCUSSION

The Court must resolve several interrelated issues as part of the Motion for Summary Judgment: (1) whether a formal development agreement between the City and DB Booneville is required to trigger liability under the Bonds; (2) whether the Bonds were statutory in nature; (3) whether the City must prove actual damages for recovery; (4) whether it is appropriate to imply certain conditions on the Bonds; and (5) what effect there is on a potential future vacation of the plat.

### A.  Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that it could cause a reasonable jury to return a verdict for either party."  *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)).  A fact is material for summary judgment purposes if it "might affect the outcome of the suit under the governing law."  *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Anderson*, 477 U.S. at 248).

At the summary judgment stage, courts must view "the facts in the light most favorable to the nonmoving party and giv[e] that party the benefit of all reasonable inferences that can be drawn from the record."  *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015) (quoting *Johnson v. Wells Fargo Bank, N.A.*, 744 F.3d 539, 541 (8th Cir. 2014)).  A court considering a motion for summary judgment should not make credibility determinations or draw inferences from the facts.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Anderson*, 477 U.S. at 255).

The nonmovant bears the burden of "showing the presence of a genuine issue for trial" sufficient that "a jury could reasonably find in his favor."  *Bedford v. Doe*, 880 F.3d 993, 997 (8th Cir. 2018) (citations omitted).  This entails more than showing that there is "some metaphysical doubt as to the material facts."  *Mensie v. City of Little Rock*, 917 F.3d 685, 688 (8th Cir. 2019) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

When considering a motion for summary judgment, a court may consider "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits."  *Church v. Anderson*, 249 F. Supp. 3d 963, 969 (N.D. Iowa 2017) (citing Fed. R. Civ. P. 56(c)).  The

essential task of the court in considering a motion for summary judgment "is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996) (citation omitted). There is no genuine issue for trial if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citation omitted).

## B. Analysis

The City argues that the Bonds are statutory requirements under Section 10-3-2, which mandates developers must either complete all improvements before final plat approval or post bonds guaranteeing completion within one year. It contends that because DB Booneville defaulted after commencement of work, Philadelphia is obligated to pay the full bond amounts to fund completion of the improvements, regardless of whether the City has incurred damages.

Philadelphia contends that Section 10-3-2 makes bonds merely an optional alternative to completed improvements—they do not impose a statutory requirement. The company argues its liability is limited to actual damages sustained by the City from the incomplete improvements, which it claims are zero because the City has no legal obligation to complete the improvements. Philadelphia also asserts that the Bonds are tied to specific improvements detailed in a September 2022 estimate, not the later-drafted construction documents the City now seeks to enforce.

The Feldmans support Philadelphia's position, arguing that there is an implied condition that the Bonds only guarantee improvements if the underlying development proceeds. They contend that because the development ceased before substantial work began—and no lots were sold—requiring payment on the Bonds would amount to an unjust windfall benefiting adjacent property owners rather than serving the intended purpose of the Bonds.

-5-

The City rejects the arguments by Philadelphia and the Feldmans. It asserts that Iowa law treats these obligations as personal to the developer rather than running with the land, that no implied conditions can be read into statutory bonds, and the City need not show damages to recover since the bonds guaranteed performance rather than indemnified against loss.

### 1.  No Contract

The first issue is whether a formal development agreement was required to create binding obligations under the Bonds. Philadelphia contends it is not liable because the City never entered into a development agreement with DB Booneville to construct the required improvements for the subdivision. [ECF No. 43-1 ¶¶ 34–35]. Although DB Booneville performed the rough grading work and installed erosion control measures, the company did not install any of the City-required improvements prior to approval of the final plat. *Id.* ¶¶ 37–38, 41. At the time that the final plat was approved, the City accepted a deed to the property upon which the right-of-way improvements were to be constructed. The City also deemed the Bonds to be satisfactory. *Id.* ¶¶ 51, 68.

The Bonds reference a September 14, 2022 agreement between the City and DB Booneville which purportedly sets forth the scope of work to be performed by the company. *Id.* ¶¶ 52–53. Philadelphia says that such an agreement does not exist. *Id.* ¶ 34. According to the company, the City concluded that a development agreement with DB Booneville was not necessary because the City did not need help with funding or constructing the subdivision, which involved minor roadways. *Id.* ¶ 35.

The City responds that the work described in the Bonds, along with the penal amount, are based on an estimate by Greiner Construction from September 14, 2022. Philadelphia argues that this position fails because the improvements for which it is obligated to pay as a surety are reflected in the Public Improvement Drawings of the Village at Sugar Creek, Plat 1. The documents are dated October 25, 2022, and were approved for construction on November 1, 2022, with final plat

approval on November 7, 2022.  According to Philadelphia, those documents cannot be the basis for the Greiner Estimate because they did not exist at the time it was prepared, or when the Bonds were provided by Philadelphia.

The City asserts that this argument ignores the project chronology and the terms of the Bonds.  It points out that CEC reviewed and commented on the construction documents before approving the final version of them.  [ECF No. 1-1].  The City notes that Philadelphia's reference to material changes in the documents between September 9 and October 25 is inconsistent with the testimony of the company's corporate designee who testified that she was unaware of any material changes between the versions of the construction documents.  [ECF No. 47-3 at 7].  This contention is further supported by the City's engineer who testified that the versions were "reasonably similar."  [ECF No. 44-3 at 19].

Prior to final approval, the City Council issued a resolution establishing site requirements for infrastructure improvements, compliance with municipal code, and posting of surety bonds.  This resolution transformed into a binding contractual arrangement once DB Booneville demonstrated acceptance through its actions—specifically by providing the required bonds and agreeing to the stated conditions.  Established legal precedent confirms that when a municipality grants rights through an ordinance and the recipient accepts and acts upon those rights, an enforceable contract is created.  In this instance, the bonds themselves established a three-party agreement, with the City serving as the beneficiary (obligee), DB Booneville as the primary responsible party (principal), and Philadelphia assuming the role of guarantor (surety).  *See* 10 McQuillin Mun. Corp. § 29:3 (3d ed.) (noting that "an ordinance granting a right, accepted and acted upon by the grantee, becomes an irrevocable contract"); *see also City of Wichita, Kan. v. Sw. Bell Tel. Co.*, 24 F.3d 1282, 1286 (10th Cir. 1994) (applying Kansas law).

## 2.   Statutory Nature of Bonds

Philadelphia also claims that the Bonds are not statutory bonds, meaning that its liability is limited to only specified "bonded improvements."   The company explains that whether a city ordinance can be the basis for a statutory bond is not relevant because Section 10-3-2 does not require the City to obtain a bond for public improvements at all.   Rather, Section 10-3-2 is an exception to the general requirement that all City-required improvements must be constructed and accepted by the City Council before approval of the final plat.

A statutory bond is "deemed to contain terms set forth in the law that requires that it be provided."   Restatement (Third) of Suretyship and Guar. § 71(2); *see also Kan. Bankers Sur. Co. v. Farmers State Bank, Yale, IA,* 408 F. Supp. 2d 751, 755 (S.D. Iowa 2005) (observing that "if a bond is of a type required by statute the general rule is that '[i]t is presumed that the intention of the parties was to execute such a bond as the law required.'") (Walters, J.) (quoting 12 Am. Jur.2d *Bonds* § 25 at 385).   A bond given pursuant to a statute will be considered a statutory bond if the parties "intended to make a statutory bond, notwithstanding the omission from the bond of other conditions required by the statute, or the inclusion of stipulations contrary to the statute."   *Philip Carey Co. v. Md. Cas. Co.*, 206 N.W. 808, 810 (Iowa 1926) (rejecting argument that technical deviations from statutory requirements negated its statutory character).   In other words, the intent of the parties controls whether a bond is statutory, provided the bond "conforms in material and essential respects to the requirements of the statute."   *Id*.   If the bond is a statutory bond, "it must be liberally construed in light of the purpose for which it was required" so "coverage required by the statute is read into the bond, and conditions not described by the statute are considered surplusage."   *Kan. Bankers Sur. Co.* 408 F. Supp. 2d at 755 (citing *First Am. State Bank v. Cont'l Ins. Co.*, 897 F.2d 319, 325 (8th Cir. 1990)).

Philadelphia interprets Section 10-3-2 as an exception to the bond obligation, allowing the City Council to waive the requirement that improvement be constructed and accepted if the subdivider posts a bond with certain provisions. Thus, according to Philadelphia, Section 10-3-2 provides an option to accept a bond under certain conditions, it does not impose a requirement to obtain a bond prior to construction of the improvements. It argues that this demonstrates that bonds are *not* required by the ordinance.

The Court finds that Philadelphia's interpretation fundamentally conflicts with both the plain language and purpose of Section 10-3-2. The ordinance states that "said improvements will be constructed within a period of one year from final acceptance of the plat"—language that mandates performance rather than offering it as an option. This language creates a statutory obligation under Iowa law. However, Section 10-3-2 provides a developer with another option: obtain approval by posting a bond guaranteeing completion. Thus, when DB Booneville chose the second option to obtain final plat approval without first completing the improvements, the posting of bonds became mandatory.

Philadelphia's interpretation is unpersuasive because the existence of two options under Section 10-3-2 does not mean there is an exception to the bond requirement. Rather, it follows logically from the fact that there would be no need for a bond if the improvements have already been completed. That does not make a bond discretionary when site improvements are not yet completed.

When a bonding requirement is imposed by law as a condition for receiving approval or permission, such bonds are statutory in nature. *See Kan. Bankers Sur. Co*., 408 F. Supp. 2d at 755. Here, DB Booneville could not have obtained final plat approval without posting these bonds. The fact that developers are offered an alternative (completing improvements before seeking approval)

-9-

does not negate the mandatory nature of the bond requirement for those who choose the second path.

Philadelphia's interpretation would undermine the purpose of subdivision bonds—to protect municipalities from bearing the cost of unfinished improvements. Under the company's flawed reading, a surety could simply characterize its bond as discretionary whenever a developer chooses to post a bond rather than complete improvements first. This would render Section 10-3-2's bonding provisions essentially meaningless, contrary to Iowa's principles of statutory construction. *See* Iowa Code § 4.4(2).

Moreover, characterizing these as statutory bonds has significant implications for the nature of Philadelphia's obligations. Statutory bonds are traditionally understood as creating suretyship obligations—where the surety steps into the principal's shoes to guarantee performance—rather than mere indemnity obligations that only promise reimbursement for losses. *See Boone Cnty. v. Jones*, 2 N.W. 987, 994 (Iowa 1879) (noting that a surety "can make no defence that could not be made by their principal"); *see also Bd. of Sups. of Stafford Cnty. v. Safeco Ins. Co. of Am.*, 310 S.E.2d 445, 450 (Va. 1983) (holding that "[a] surety stands in the place of its principal and may raise only defenses available to the principal."). This distinction is particularly relevant here, where Philadelphia attempts to transform its performance guarantee into a simple promise of reimbursement. Such an interpretation would undermine the very purpose of subdivision bonds in the statutory scheme.

Because Section 10-3-2 mandated the bonds in this situation, they are statutory bonds. As such, the coverage required by the ordinance is read into the bonds, and they must be liberally construed to effectuate their purpose. *Am. Tr. & Sav. Bank v. U.S. Fid. & Guar. Co.*, 418 N.W.2d 853, 854 (Iowa 1988) (noting that "[t]he coverage required by the statute will be read into the bond.") (citing *State Sur. Co. v. Lensing*, 249 N.W.2d 608, 611 (Iowa 1977)). Section 10-3-2

-10-

expressly provides that bonds must cover "all improvements required by the city." [ECF No. 30-1 ¶ 1]. The improvements required by the City, in this case, are described and detailed in the construction documents. *See* [ECF No. 1-1]. Philadelphia's arguments regarding what should be properly regarded as a "bonded improvement" does not change the requirements of the statutory bonds. The statutory nature of the Bonds has significant implications for their interpretation and enforcement. As statutory bonds, they must be construed liberally to effectuate their purpose under Section 10-3-2 without reading in limitations that are absent from the ordinance.

### 3. Damages Requirement

Having established the statutory nature of the Bonds, the Court must determine whether proof of actual damages is required for recovery. Philadelphia contends the City must prove that it suffered actual damages to recover. The company argues that this is because the purpose of a subdivision bond "is to prevent the subdivision form becoming an undue burden on the community and local taxpayer." [ECF No. 43 at 9]. Philadelphia maintains that in this case, "there is no subdivision to become an undue burden on the community and local taxpayers." *Id*. The company argues that payment would constitute an improper windfall "when no damages have been sustained." *Id*. at 10.

Philadelphia claims that the City does not face any legal exposure for failure to complete the improvements—it has the option to vacate the right-of-way and deed the property on which the right-of-way was to be constructed. [ECF No. 43-1 ¶ 73]. The company insists that it cannot manufacture non-existent damages or recover funds to construct public improvements for the benefit of private landowners. [ECF No. 43 at 11].

Philadelphia's position is not supported by Iowa law. Suretyship is distinguished from an indemnity-only bond which serves "to pay the plaintiff such damages as he has in fact suffered." *Fellows v. Errington*, 170 N.W. 545, 547 (Iowa 1919). In other words, while an indemnitor's

obligation extends only to restoring an indemnitee to its pre-loss position, a surety assumes all obligations of the principal, standing in the principal's shoes rather than merely promising reimbursement for losses. *Id.* The City urges that, under a suretyship, an obligee does not need to have spent funds to recover under Iowa law. [ECF No. 30-2 at 9].

More fundamentally, the obligation to complete site improvements does not run with the land—which is the position of Philadelphia and the Feldmans—but is a personal obligation of the developer. *See Associated Grocers of Iowa Co-op., Inc. v. West*, 297 N.W.2d 103 (Iowa 1980). In *Associated Grocers*, the Iowa Supreme Court addressed whether an obligation to install site improvements runs with the land or is personal to the developer. The court held that "[t]he installation of the spurs and the paving of the streets required a one-time performance only,' and "[t]he paving was to be done 'immediately,'" therefore, the obligation was personal to the developer. *Associated Grocers*, 297 N.W.2d at 106.

Like the obligation at issue in *Associated Grocers*, DB Boonville's commitment under Section 10-3-2 to construct improvements within one year constitutes a one-time performance obligation. *Associated Grocers* made clear that this obligation is personal to DB Booneville despite the development's failure, foreclosure, and change in property ownership. *Id.* at 107. The Iowa Supreme Court rejected arguments about impossibility or impracticability due to increased costs or foreclosure, meaning Philadelphia cannot escape liability because the development proved financially unsuccessful. This reasoning confirms that subdivision bonds secure the personal obligations of developers, which persist notwithstanding any subsequent changes to the land's status or ownership. This principle forecloses Philadelphia's argument that its liability should be contingent on the development's completion by future landowners.

The Bonds secured this personal obligation. As the surety to DB Boonville, Philadelphia "is bound with his principal in all respects" and the City is not obligated to spend funds before

recovering.  *See Fellows*, 170 N.W. at 547; *Charles City v. Rasmussen*, 232 N.W. 137, 138–39 (Iowa 1930) (holding that "the city is not required to do this repair work before it can maintain an action on the bond").

Courts across multiple jurisdictions have consistently held that an obligee "need not incur any expense or do any work on the improvements before collecting on the bond" because it "is intended to guarantee completion of the improvements its covers."  *Furlong Dev. Co., LLC v. Georgetown-Scott Cnty. Planning & Zoning Comm'n*, 504 S.W.3d 34, 39 (Ky. 2016) (quoting *Stafford Cnty*, 310 S.E.2d at 449).  Here, the evidence clearly shows that "the performance secured by the bonds has not been completed," therefore, the City is entitled to collect on them.  *Cnty. of Brunswick v. Lexon Ins. Co.*, 710 F. Supp. 2d 520, 525 (E.D. N.C. 2010).

While the City is entitled to recover on the Bonds, its recovery is limited to the penal sum specified in those Bonds.  Philadelphia issued two Bonds with a collective maximum penal sum of $3,410,515.00, naming the City as obligee.  [ECF No. 30-1 ¶ 6].  The City has presented evidence that the estimated costs to complete the installation of public improvements is $3,543,699.83, and it has already incurred $233,014.96 to remedy stormwater discharge issues.  *Id.* ¶¶ 11–12.  These combined costs exceed the penal sum of the Bonds.  Under Iowa law, "the surety is liable to the owner for the damages caused by the contractor's default but only up to the penal sum of the bond."  *Emps. Mut. Cas. v. United Fire & Cas. Co*., 682 N.W.2d 452, 456 (Iowa Ct. App. 2004) (citation omitted).  Therefore, while the actual damages may exceed the bond amount, Philadelphia's liability is capped at the combined penal sum of $3,410,515.00. This limitation is consistent with the fundamental principle of suretyship that a surety's liability cannot exceed the amount it specifically agreed to guarantee.

4.  Implied Conditions

Philadelphia seeks to insert implied terms into the Bonds.  The company argues that the Bonds "were provided to secure the City against damages caused by DB Booneville's failure to complete the improvements detailed in the Bonds."  [ECF No. 43 at 3].  However, there is no mention of "damages" in Section 10-3-2 or the Bonds.  The Bonds expressly reference "work" but do not speak of "damages."  This is consistent with the understanding of Philadelphia's corporate designee who testified that the company's obligation extended to "pay[ing] for the cost of completion of the improvement, if DB Booneville fails to complete."  [ECF No. 30-3 at 62].

When asked about Philadelphia's understanding of its obligations pursuant to the terms of the Bonds, its corporate designee Shashauna Szczechowicz responded that "Philadelphia's obligation is to pay for the cost of completion of the improvements, if DB Booneville fails to complete."  *Id*.  Szczechowicz did not describe Philadelphia's obligation as being limited to "damages" or contingent on private development proceeding.  Nor did she indicate the obligation was limited to reimbursing the City for costs already incurred.

Her testimony contradicts Philadelphia's current position limiting its liability to actual damages sustained by the City.  Rather, it suggests Philadelphia regarded its obligations under the Bonds to involve payment for completing the improvements in the event of a default by DB Booneville.  Philadelphia's understanding of its obligations is certainly not dispositive.  But it aligns with the City's interpretation of the Bonds and is most consistent with Section 10-3-2, supporting the conclusion that the Bonds guaranteed completion of the improvements rather than merely indemnifying against loss.

Philadelphia similarly urges that the City must have an agreement with a third party to complete the site improvements.  Again, this condition does not appear in Section 10-3-2 or the Bonds.  The City emphasizes that its decision about a need for site improvements is not subject to

judicial second-guessing. *See Oakes Constr. Co. v. City of Iowa City*, 304 N.W.2d 797, 808 (Iowa 1981). The City correctly identifies Philadelphia's "myopic focus on this development" while at the same time "ignor[ing] the City's need to consider the entire community plan." [ECF No. 47 at 8] (quoting *Oakes Constr. Co.*, 304 N.W.2d at 805) ("Although the individual subdivider may see his particular subdivision as a complete unit, the planning agency or commission must necessarily view it as a segment of an entire community.").

The Feldmans also seek to imply a condition that site improvements are dependent on nearby private development. However, no such condition exists in either Section 10-3-2 or the text of the Bonds. This attempt to read in implied conditions ignores both the statutory framework and the City's broader responsibility to consider community-wide planning needs.

The Feldmans' focus on private development status improperly shifts attention away from the statutory factors that guide subdivision review such as comprehensive plan conformity and balancing interests between developers, future purchasers, and the public. *See* Iowa Code § 354.8(1). Moreover, the City's decisions regarding necessary infrastructure improvements are discretionary legislative determinations that courts cannot second-guess absent clear evidence of "fraud, bad faith, or arbitrary abuse of discretion." *Oakes Constr. Co.*, 304 N.W.2d at 808. The Feldmans' proposed implied condition would improperly restrict the City's ability to make these determinations based on the needs of the broader community rather than just the status of individual private development projects.

Implying such terms would contradict the rule that statutory bonds "should be construed in light of the purpose as expressed by the statute." *Lensing*, 249 N.W.2d at 611 (citing 11 C.J.S. *Bonds* § 39). The imposition of implied conditions is disfavored under Iowa law. *See Farm Bureau Life Ins. Co. v. Holmes Murphy & Assocs., Inc.*, 831 N.W.2d 129, 134 (Iowa 2013) ("[I]f there is no ambiguity, the court will not rewrite the policy for the parties."); *Smith v. Stowell*,

125 N.W.2d 795, 799 (Iowa 1964) (noting that a court may not rewrite or remake a contract under the guise of construction).

The cases Philadelphia cites to support its position on the implied condition are factually distinguishable. Unlike *County of Yuba v. Central Valley National Bank, Inc.*, 20 Cal. App. 3d 109 (Ct. App. 1971), construction has already commenced here. In that case, the California Court of Appeals noted that there was undisputed evidence in the record that "the property would merely revert to acreage under the instrument of credit if construction did not begin." *Id.*

Similarly distinguishable is a case that relied upon a New York law which expressly "place[d] certain limitations upon the right of an obligee to collect the proceeds of a performance bond" such as requiring that it be in an amount "commensurate with the extent of building development that has taken place in the subdivision." *Town of New Windsor v. Inbro Dev. Corp.*, 448 N.Y.S.2d 99 (Sup. Ct. 1982). Iowa law imposes no such limitation on recovery based on development progress.

This case is distinguishable from *Westchester Fire Insurance Co. v. City of Brooksville* because Section 10-3-2 requires bonds "guaranteeing that said improvements will be constructed," without limiting liability only to utility service improvements. 731 F. Supp. 2d 1298, 1306 (M.D. Fla. 2010). The federal district court in that case applied Florida law to hold that "installation of the improvements is subject to 'an implied or constructive condition that those improvements [are] required only if the developer proceeded with the project contemplated by the application and approval.'" *Id.* at 1305 (quoting *River Vale Planning Bd. v. E & R Off. Interiors, Inc.*, 575 A.2d 55, 59–60 (N.J. Super. App. Div. 1990)). However, the reasoning in that case is inapplicable here for several distinct reasons.

First, Iowa law specifically disfavors implied conditions in contracts, particularly statutory bonds which must be "construed in light of the purpose as expressed by the statute." *Lensing*,

-16-

249 N.W.2d at 611.  Second, the concern in that case about requiring a surety "to pay for improvements for a residential development that may never be built" conflicts with Iowa's treatment of these obligations as personal to the developer.  *City of Brooksville*, 731 F. Supp. 2d at 1305.  Unlike Florida, Iowa has expressly rejected the notion that such obligations depend on future development.  *See Associated Grocers*, 297 N.W.2d at 106.  Third, the United States Court of Appeals for the Ninth Circuit reversed a district court's reliance on *City of Brooksville* because the implied conditions were contrary to the express terms of the bond.  *Cnty. of Mohave v. Lexon Sur. Grp., LLC*, No. 15-17167, 2017 WL 4844258, at *1 (9th Cir. Sept. 18, 2017).

Most detrimental to Philadelphia's position, the holding pronounced in *City of Brooksville* has been rejected in other courts.  In *City of Merced v. American Motorists Insurance Co*., the California Court of Appeal distinguished *County of Yuba* (which *City of Brookville* had relied upon) by noting that where any construction has commenced, the surety's obligations mature. 126 Cal. App. 4th 1316, 1326 (2005).  The record conclusively demonstrates that DB Booneville commenced construction, distinguishing this case from the "no construction whatsoever" scenario in *City of Brookville*.  [ECF No. 30-1 ¶¶ 8–9].

Given Iowa's clear precedent disfavoring implied conditions in statutory bonds and the commencement of construction by DB Booneville the Court will decline to read implied conditions into the Bonds, conditions which would fundamentally alter their statutory purpose.

### 5.  Effect of Future Plat Vacation

The final issue is whether the possibility of future plat vacation affects Philadelphia's current obligations under the Bonds.  The company suggests it may be discharged from liability if the City vacates the right-of-way in the future. This argument is premature as the City has not vacated the plat.  Under Iowa law, Philadelphia's obligations remain unchanged unless and until the approved final plat is vacated.

*City of Ames v. Schill Builders, Inc.*, 292 N.W.2d 678 (Iowa 1980) provides important guidance on this issue. The procedural posture in *City of Ames* closely mirrors the present case, as both involve attempts by sureties to avoid liability following a development's failure. In that case, the Iowa Supreme Court considered whether a surety remained liable on subdivision bonds after a developer defaulted and a lender foreclosed on the property. The court held that the surety was released from liability only after the original plat was formally vacated and a new plat approved. *City of Ames*, 292 N.W.2d at 681–82. The court explained: "[w]hen the original plat was vacated and the new plat . . . was accepted by the City, we hold [the new owner] became responsible to the City for the public improvements required of the developer." *Id*. at 681.

Here, it is undisputed that the City has not vacated the final plat for The Village at Sugar Creek. Therefore, under *City of Ames*, Philadelphia's obligations under the Bonds remain in full force. The Iowa Supreme Court noted that while the City "could have compelled the surety to pay had it elected to do so" immediately after default, a surety is only released when a new plat is approved placing the improvement obligations on a new party. *Id*. at 682. Philadelphia's argument regarding potential future vacation of the plat is premature and does not affect its current liability under the Bonds.

This case defeats Philadelphia's argument regarding potential plat vacation. Moreover, it reinforces the principle that a surety's obligations remain in place until formally displaced by subsequent events. Taken together, these issues demonstrate that Philadelphia's obligations under the Bonds are mandatory, comprehensive, and enforceable regardless of the development's fate. The statutory framework and Iowa precedent compel this result, protecting municipalities from bearing the cost of incomplete improvements while providing clarity regarding the scope of a surety's obligations.

### III.     CONCLUSION

For the reasons discussed above, the Motion for Summary Judgment is GRANTED.  [ECF No. 30].  The Court concludes that the Bonds issued by Philadelphia are statutory under Section 10-3-2 of the West Des Moines City Code; guaranteed completion of specified improvements; and created a personal obligation that survived the development's failure.  Because the Bonds were performance guarantees rather than indemnity instruments, the City need not prove actual damages to recover.  The City is therefore entitled to judgment in the amount of $3,410,515.00, representing the full penal sum of the Bonds.

IT IS SO ORDERED.

Dated this 27th day of February, 2025.

_____
STEPHANIE M. ROSE, CHIEF JUDGE
UNITED STATES DISTRICT COURT